[Cite as *State v. Blevins*, 2016-Ohio-5049.]

**IN THE COURT OF APPEALS OF OHIO**
**SECOND APPELLATE DISTRICT**
**CLARK COUNTY**

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Plaintiff-Appellee | : | Appellate Case No. 2014-CA-47 |
| | : | |
| v. | : | Trial Court Case No. 2013-CR-654 |
| | : | |
| LISA BLEVINS | : | (Criminal Appeal from |
| | : | Common Pleas Court) |
| Defendant-Appellant | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 22nd day of July, 2016.

. . . . . . . . . .

AMY M. SMITH, Atty. Reg. No. 0081712, Clark County Prosecutor's Office, 50 East Columbia Street, Suite 449, Springfield, Ohio 45502
      Attorney for Plaintiff-Appellee

JEFFREY T. GRAMZA, Atty. Reg. No. 0053392, Talbott Tower, Suite 1210, 131 North Ludlow Street, Dayton, Ohio 45402
      Attorney for Defendant-Appellant

. . . . . . . . . . . .

HALL, J.

{¶ 1} Lisa Blevins appeals from her conviction and sentence following a bench trial on ten counts of forgery and two counts of theft. In her sole assignment of error, Blevins challenges the legal sufficiency and manifest weight of the evidence to support the guilty

verdict.

{¶ 2} The State's evidence established that Blevins worked as a bookkeeper/accountant for the Kreider Corporation in Springfield, Ohio. She was one of four employees in the company's business office. She began working there in the 1990s and became responsible for paying bills and writing checks in 2003. Kreider vice-president and general manager John Patton testified that he and owner Art Gianakopoulous were the only people authorized to sign the checks written on behalf of Kreider.

{¶ 3} In April 2013, the Capital One credit-card company contacted Patton and advised him that five Kreider business checks had been used to pay a personal credit card account in the name of Blevins and her daughter. The checks were payable to Capital One and appeared to bear Patton's signature. Patton testified, however, that the signature was not his. He subsequently discovered that the checks falsely had been entered into Kreider's accounting system as having been issued to legitimate Kreider vendors, not to Capital One. Patton called Blevins into his office and confronted her with the checks. According to Patton, Blevins admitted that she had used the checks to pay her credit card. She assured him that those five checks were all she had taken.

{¶ 4} Patton fired Blevins and commenced a thorough investigation. He ultimately discovered more than 1,000 Kreider checks that had been issued without authorization. Although each of the checks bore his signature, he testified that he did not sign any of them. Some of them did not appear in Kreider's accounting system. Others appeared in the system but falsely were entered as if they were issued to pay bona fide business expenses when, in fact, they were payable directly to Blevins, to her creditors, or to

business entities with which she had a relationship. The checks had been completed manually on a typewriter rather than being computer generated, which was the typical practice at Kreider. After Blevins' discharge, Patton found stacks of blank Kreider checks in her desk drawers. Although the company used these checks when a manual check was necessary, the blank checks normally were stored in a safe.

{¶ 5} Rebecca Barrett, an expert forensic document examiner, testified about her review of the handwriting on all of the checks. She examined known signatures of Patton and Blevins as well as the payor signatures authorizing payment of the checks and the endorsing signatures on the reverse side. Barrett explained that she stated her findings using a sliding scale of certainty regarding the authenticity of the signatures. The top end of the scale was a positive "identification" of a particular person as the writer. The bottom end was "elimination" of a person as the writer. In order of reducing certainty, the middle levels of the scale included "probably written by," "indications may have been written by," "no opinion," "indications may not have been written by," and "probably not written by."

{¶ 6} With respect to Patton's purported signature as payor, Barrett concluded that the majority of the checks had "indications he may not have written them; and then the rest of them were no opinion as to if he wrote them or not." She explained that her uncertainty stemmed from the quality of the check copies she examined, the fact that many of the checks had stamps over the signatures, and the fact that she had a limited sample of Patton's actual signature to use for comparison. With regard to 387 of the checks payable to the order of Blevins, Barrett concluded that 127 were positive identifications, 131 were "probably written by" her, 87 had "indications" they were written by her, 41 were "no opinion," and one had "indications [it] may not have been written by"

her.

{¶ 7} Detective Edward Icehour also testified for the State and linked the checks at issue to accounts associated with Blevins or her children. Sometimes Blevins' account number was written on the front. Other times her account number was stamped on the check. On other occasions, a Kreider check was paid to a business on a date and in an amount that corresponded to a bill that had been sent to Blevins. The Kreider checks had been used to pay Blevins' mortgages, her car payments, her credit cards, her utilities, her cell phone bill, and other things. In particular, the checks had been used to pay bills from Home Depot, Columbia Gas, Pier 1, Macy's, J.C. Penny's, Lowes, Capital One, TJ Maxx, Cififinancial, Ohio Edison, Kohl's, Dell, Victoria's Secret, Navy Federal Credit Union, AT&T, SBC, Sprint, Verizon, Nationstar, Bank of America, Taylor Bean & Whitaker, Wells Fargo, the Clark County Treasurer, GM, National City/PNC Bank, Jeff Wyler Automotive, U.S. Bank, Ally Bank, Chase, GMAC, Toyota, Hyundai, Fifth Third, and Security National Bank. In addition, Icehour traced directly to Blevins' checking account 390 Kreider checks that were payable to her. These checks were in addition to Blevins' normal payroll checks, which Icehour also identified.

{¶ 8} Based on the evidence presented, the trial court found Blevins guilty of first-degree-felony theft in violation of R.C. 2913.02(A)(1), first-degree-felony theft in violation of R.C. 2913.02(A)(3), and 10 counts of forgery in violation of R.C. 2913.31(A(1), as charged in the indictment. The trial court also found that the dollar amount involved with respect to each theft count was more than $1.5 million. At sentencing, the trial court found all of the convictions subject to merger and proceeded to sentencing solely on count one,

which involved theft in violation of R.C. 2913.02(A)(1). The trial court imposed an eight-year prison term and ordered Blevins to pay court costs and restitution. This appeal followed.

{¶ 9} In her sole assignment of error, Blevins challenges the legal sufficiency and manifest weight of the evidence to support the trial court's verdict. She stresses that a theft conviction required proof that she knowingly obtained or exerted control over Kreider property valued at more than $1.5 million. She argues that the only way she allegedly did so was by forging Kreider checks. She points out, however, that she only was charged with forging 10 checks that had a value nowhere near $1.5 million. Although the total value of the more than 1,000 checks at issue was well over $1.5 million, Blevins contends the State failed to prove that she forged them.

{¶ 10} Blevins' argument on the issue is as follows:

The problem with the Government's version of events is that it failed to present sufficient evidence that Appellant forged the writings of another to the extent that she obtained $1.5 million of an owner's property or services. There was circumstantial evidence presented that Appellant made deposits, made payments on debt, made purchases, etc. with money that possibly was taken from Kreider Corporation. There was certainly *not* sufficient evidence—not sufficient to prove beyond a reasonable doubt— that Appellant forged checks amounting to $1.5 million.

The fact of the matter is that Appellant is not even alleged in this case to have forged checks that resulted in her obtaining that much money. At the outset, she was alleged in this case to have forged ten checks. The

Government, of course, did present evidence at trial that *someone* forged checks—1,059 of them—and that Appellant had and spent money in amounts that she maybe should not have had the opportunity to obtain on her bookkeeper's salary. The Government also presented evidence—via the testimony of its forensic expert—that Appellant forged a number of checks. The problem with the Government's case is the insufficiency of proof that: 1) Appellant forged checks in the amount of money alleged to have been taken from the owner, and 2) where the amounts of money she had and spent came from, i.e., how she actually obtained those amounts.

Each and every element of an alleged offense must be proven beyond a reasonable doubt in order to sustain a conviction. To be proven guilty of theft, the Government must prove beyond a reasonable doubt that Appellant obtained or exerted control over the property of Kreider to the tune of $1.5 million. Without also proving beyond a reasonable doubt that Appellant forged checks in that amount, there is simply no way to prove that she obtained *the alleged amount* of money from the alleged victim, Kreider Corporation.

What proof was presented at trial that Appellant forged checks? John Patton said that he definitely did not sign a majority of the checks that he examined in the course of the investigation of the case. Rebecca Barrett said that, on the majority of the checks she examined, there were *indications* that John Patton *may* not have signed the check as payor. She further asserted her certainty that just 127 of the 387 checks she examined

were endorsed by Appellant. Ms. Barrett could *not* say with any degree of certainty that Appellant had signed any checks as payor, with Mr. Patton's or anyone else's name.

The proof presented at trial that Appellant forged checks in the amount of $1.5 million or more fell far short of the beyond-a-reasonable-doubt standard. It follows, then, that if the Government did not prove that Appellant forged checks in that amount, the Government must prove how else she obtained that amount from Kreider Corporation. No proof whatsoever was presented to show any other means that she may have obtained the money. If it can be argued that the Government proved that Appellant forged ten checks, or even 127 checks, there is no viable argument that she forged anywhere close to 1,059 of them.

(Appellant's brief at 7-8).

{¶ 11} Upon review, we find Blevins' argument to be unpersuasive. Patton testified that he did not sign *any* of the checks at issue. (*See, e.g.*, Tr. Vol. 9 at 2674, 2710, 2712). His testimony on that issue is not inconsistent with Barrett's testimony that she either found "indications" he may not have signed the checks or had no opinion in that regard. Common sense also supports a determination that Patton's testimony about not signing the checks was credible. He had no conceivable business purpose for signing more than 1,000 Kreider checks for more than $1.5 million payable directly to Blevins or to accounts associated with her. Therefore, the evidence supports a finding that *someone* forged *all* of the disputed checks bearing Patton's signature.

{¶ 12} The trial court reasonably could have inferred from the record that the

person who forged all of the checks was Blevins. When she was fired, she essentially admitted forging the few checks Patton had discovered at that point, acknowledging that she had stolen the money. As for the other checks, Blevins is the only Kreider employee who benefitted from the forgery of the checks. All of them were payable to her or to accounts associated with her. This fact supports an inference that she is the person who stole the checks and forged Patton's signature. Indeed, we see no plausible reason why another Kreider employee, or anyone else, would have forged Patton's signature on more than 1,000 checks over a 10-year period solely for Blevins' benefit.[1]

{¶ 13} In addition, the record reflects that Blevins was well positioned to carry out the large-scale theft over an extended time. As set forth above, blank Kreider checks were found in her desk. (*Id.* at 2663-2664). The checks at issue were completed manually on a typewriter rather than computer generated. Kreider's business office had two typewriters, one of which was located on Blevins' desk. (*Id.* at 2665). The other was located on the desk of receptionist Carolyn Black. (*Id.* at 2681). But Black did not benefit financially from any of the forged checks, and she did not have Blevins' job, which included processing accounts payable. That task involved matching a purchase order with an invoice, recording the information, and issuing a Kreider check for Patton's signature. (Tr. Vol. 2 at 338). Because she handled accounts payable, Blevins was uniquely situated to enter the forged checks into Kreider's accounting system as having been issued to bona fide vendors, which is how the theft was perpetrated for so long

---

[1] We suppose Blevins conceivably could have aided and abetted an unidentified accomplice such as a family member who actually wrote Patton's name on the stolen checks as payor. Regardless, based on the reasoning set forth above, the evidence still would support a finding, beyond a reasonable doubt, that Blevins participated in the forgery and theft of the checks at issue, making her guilty of the charged offenses.

without detection.

{¶ 14} Although the case against Blevins may have been largely circumstantial, it is beyond dispute that "[c]ircumstantial evidence and direct evidence have the same probative value." *State v. Peterson*, 2d Dist. Champaign No. 2014-CA-1, 2015-Ohio-789, ¶ 20. Here, the circumstantial evidence strongly supports the trial court's verdict finding Blevins guilty of theft of more than $1.5 million and forgery. Viewing the evidence in a light most favorable to the State, the trial court could have found the crimes proven beyond a reasonable doubt. This is not an exceptional case in which the trial court clearly lost its way and created a manifest miscarriage of justice. Accordingly, we overrule Blevins' assignment of error.

{¶ 15} The judgment of the Clark County Common Pleas Court is affirmed.

. . . . . . . . . . . . .

DONOVAN, P.J., and FROELICH, J., concur.

Copies mailed to:

Amy M. Smith
Jeffrey T. Gramza
Hon. William B. McCracken
(sitting by assignment)